MARK K. SCHONFELD (MS-2798)
REGIONAL DIRECTOR
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
3 World Financial Center
New York, NY 10281-1022
(212) 336-1020



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————

SECURITIES AND EXCHANGE COMMISSION,      :

                              Plaintiff,      :

               - against -      :

                                      :

AIMSI TECHNOLOGIES, INC., REGINALD      :
HALL, HARRIS DEMPSEY "BUTCH" BALLOW,      :      **COMPLAINT**
EVERETT BASSIE, WINFRED FIELDS,      :
and BRUCE CHARLES POLLOCK      :

                               :

                    Defendants,      :

               - and -      :

WILLIAM WATKINS, DOLORES WATKINS,      :
WRIGHT FAMILY HOLDINGS, INC.,      :
WRIGHT FAMILY TRUST, GBY INTERNATIONAL :
PUBLIC RELATIONS, INC., BP INTERNATIONAL, :
INC., SECURE RELEASES, INC., CHINA      :
GLOBAL DISTRIBUTION CORP., LINES      :
OVERSEAS MANAGEMENT, WONDERLAND      :
CAPITAL CORP., PRIVATE FUNDING CORP., and :
OREKOYA CAPITAL CORP.,      :

                Relief Defendants.      :

———————————————————————

      Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants Aimsi Technologies, Inc. ("Aimsi"), Reginald Hall, Everett R. Bassie, Winfred

Fields, Bruce Pollock, and Harris Ballow, and against Relief Defendants William Watkins,

Wright Family Holdings, Inc. ("WFH"), Wright Family Trust ("WFT"), GBY International Public Relations, Inc. ("GBY"), BP International, Inc. ("BPI"), Secure Releases, Inc. China Global Distribution Corp. Lines Overseas Management ("Lines"), Wonderland Capital Corp., Private Funding Corp. and Orekoya Capital Corp., alleges as follows:

## **PRELIMINARY STATEMENT**

1.       This action concerns defendants' scheme to defraud the investing public through the intentional manipulation of the market for the stock of Aimsi, a company which claims to be developing a hand-held homeland security device known as the Automatic Large Area Radiation Mapper ("ALARM"). Aimsi became public through a reverse merger engineered by defendants in June 2004.   From July 2004 through at least November 2004, defendants ran a promotional campaign consisting of press releases, mass faxes and internet postings, in which they repeatedly, deliberately and materially misrepresented Aimsi's financial prospects and touted Aimsi's stock.

2.       Defendants disseminated this false and misleading information solely to drive up the trading volume and price of Aimsi's stock, and afford defendants the opportunity to sell the shares that they had just recently acquired in Aimsi at a substantial profit.  Certain of the defendants set up off-shore entities at the time they acquired their positions in Aimsi, solely for the purpose of protecting their unlawful gains from the regulatory authorities.

3.       On December 15, 2004, the Commission ordered a ten-day suspension in the trading of Aimsi's stock.  Before the Commission ordered that suspension, defendants' plan was partially successful, yielding at least $3 million in illicit trading profits.

4.       Defendants, directly or indirectly, have engaged, are engaging, and are about to engage, in transactions, acts, practices and courses of business that constitute or would constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a),

Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and

Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

5.        The Commission brings this action to halt any ongoing fraudulent activity, to

prevent the dissipation of any remaining assets, and to compel an accounting of defendants' assets

and their transactions in securities in Aimsi. Unless restrained and enjoined by this Court,

defendants will continue to engage in the unlawful acts, practices and courses of business

described herein, to the substantial detriment of the investing public.

## JURISDICTION AND VENUE

6.        The Commission brings this action pursuant to authority conferred upon it by

Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d) of the Exchange Act, 15

U.S.C. § 78u(d), seeking to temporarily restrain, and preliminarily and permanently enjoin

defendants from engaging in the wrongful conduct alleged herein, and to obtain certain other

equitable relief, including disgorgement of ill-gotten profits plus prejudgment interest thereon, civil

monetary penalties, officer and director bars pursuant to Section 20(d) of the Securities Act, 15

U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), and penny stock bars

pursuant to Section 20(g) of the Securities Act and 21(d)(6) of the Exchange Act, and for such

other and further relief as this Court may deem appropriate.

7.        The Commission also seeks equitable relief during the pendency of this action,

including an Order: (a) temporarily restraining and preliminarily enjoining defendants from future

violations of the provisions of the Securities Act and Exchange Act they are alleged to have

violated; (b) freezing the assets of defendants and certain assets of Relief Defendants; (c) directing

each of the defendants immediately to provide verified written accountings, under penalty of

perjury, of their assets, and their transactions in securities in Aimsi; (d) enjoining and restraining

defendants from transferring, or assisting or permitting, directly or indirectly, the transfer of, shares of Aimsi's stock, (e) prohibiting the destruction, alteration or concealment of documents by defendants; and (f) granting expedited discovery.

8.      This Court has jurisdiction over this action and venue lies in this District, pursuant to Sections 20(b) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b) and 77v(a), and Sections 21(d), 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 77u(e) and 78aa. Defendants, directly or indirectly, singly or in concert, have made use of the means or instruments of transportation or communication in, or the means or instrumentalities of, interstate commerce, or the use of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

## DEFENDANTS

9.      **Aimsi** is a corporation organized under the laws of Utah, with its principal place of business in Oak Ridge, Tennessee. It became a public company on June 29, 2004 as Advanced Integrated Management Services, Inc. ("Advanced Integrated"), through a reverse merger with a shell corporation, Carmina Technologies, Inc. Advanced Integrated changed its name to Aimsi Technologies, Inc. on October 19, 2004. According to its public filings, Aimsi's business consists of engineering, scientific and technical services in nuclear and environmental services and information technology management. On November 17, 2004, Aimsi conducted a five-for-one forward split in its shares, which had the effect of increasing the total number of outstanding shares five-fold.

10.     **Reginald Hall,** age 45, resides in Oak Ridge, Tennessee, founded Advanced Integrated in 1994. Hall serves as Aimsi's CEO, President and Director.

4

11.        **Harris Ballow,** age 61, is a stock promoter with a history of defrauding investors through market manipulation schemes. Ballow resided in Galveston, Texas until December 2004, after he had pled guilty to federal criminal charges relating to a scheme to defraud investors. Released from incarceration before his sentencing, Ballow fled to Panama or Costa Rica, where he owns residences. Ballow has twice previously been sued by the Commission for fraudulent schemes to manipulate the market for securities: SEC v. Harris Dempsey Ballow, Christopher Harless, Murry Shepherd and Diane L. Johnson, H-01-CV-2579 (S.D. Tex.), and SEC v. Carl R. Rose, et al., H-04-CV-2799 (S.D. Tex.). In the former case, Ballow was found liable for securities fraud by engaging in a deliberate scheme to manipulate the market for an issuer's stock. The latter case is pending. In 1999, Ballow was also found liable in a state court proceeding in Texas for defrauding investors, and was ordered not only to pay damages, but $8 million in punitive damages as well.

12.        **Bruce Pollock,** age 40, resides in Houston, Texas. Pollock is the principal owner of Secure Releases, Inc., which contracted with Aimsi to accomplish its reverse merger in June 2004. Pollock is an associate of Ballow, Fields and Bassie, and he assisted Aimsi's reverse merger with Fields, Bassie and Ballow. In return, Pollock (via Secure Releases) received approximately 2 million pre-split shares (approximately 10 million post-split shares) in Aimsi stock.

13.        **Winfred Fields** , age 39, resides in Houston, Texas. Fields is an associate of Ballow, Pollock and Bassie, and he assisted Aimsi in accomplishing its reverse merger together with them. In return, Fields received approximately 2 million pre-split shares (approximately 10 million post-split shares) of Aimsi's stock. Fields is also a defendant in SEC v. OSF, Inc., No. H-04-4291 (S. D. Tex.), in which the Commission has alleged that Fields (among others), orchestrated an illegal distribution of approximately 22.2 million shares of an issuer's stock to the

public, and in furtherance of that distribution, disseminated a series of false press releases from the issuer, as well as unsolicited junk faxes and spam emails that republished information contained in the false releases.

14.     **Everett R. Bassie**, age 52, resides in Houston, Texas.   Bassie is an associate of Ballow, Pollock and Fields, and he assisted Aimsi's reverse merger, together with Fields, Pollock and Ballow.  After the reverse merger, Bassie was named a member of the Board of Directors of Aimsi, and received approximately 2 million pre-split shares (approximately 10 million post-split shares) in Aimsi stock.

15.     Defendants Fields, Bassie, Pollock and Ballow (sometimes collectively referred to hereinafter as the "Promoter Defendants") are known to one another from past associations with thinly-capitalized private and/or public shell companies.  This prior work has consisted of orchestrating and/or assisting in promotional campaigns designed to push up the trading volume and price of the stock in question temporarily, so that they and their associates could sell them into the market at inflated prices.  Pollock and Ballow have been primarily responsible for procuring public shell companies and organizing and initiating the promotional campaigns.  Fields and Bassie performed tax, audit and other accounting work in connection with the promotional campaigns on behalf of these entities.

### RELIEF DEFENDANTS

16.     **WFT** and **WFH** are entities established, owned and controlled by defendant Ballow under the laws of Panama or the Commonwealth of Dominica.  WFT and WFH maintain an address in Houston, Texas that is the same as defendant Field's address.  WFT and WFH were established at the direction of Ballow for the purpose of taking custody and possession of the shares in Aimsi that the Promoter Defendants had received.  The purpose was to allow the

Promoter Defendants to shield their trading and profits in Aimsi securities from scrutiny and recovery by regulatory authorities and afford Ballow a mechanism to control trading and the trading profits in Aimsi stock.   WFT and WFH received at least 2 million shares in Aimsi from the Promoter Defendants, and disposed of all, or substantially all, of them at a large profit, as discussed in more detail below.

17.     **GBY** was established by Fields and Ballow under the laws of Panama, and is owned or controlled by Fields and Ballow. GBY maintains an address in Houston, Texas that is the same as defendant Fields' address. GBY was established at the direction of Ballow for the purpose of taking custody and possession of the shares in Aimsi that the Promoter Defendants had received. The purpose was to allow the Promoter Defendants to shield their trading and profits in Aimsi securities from scrutiny and recovery by regulatory authorities, and afford Ballow a mechanism to control trading and the trading profits in Aimsi stock. GBY received at least 2 million shares of stock in Aimsi from the Promoter Defendants.

18.     **BPI** was established by Pollock and Ballow under the laws of Panama, and is owned or controlled by Pollock and Ballow. BPI maintains an address in Houston, Texas that is the same as defendant Pollock's address. BPI was established at the direction of Ballow for the purpose of taking custody and possession of the shares in Aimsi that the Promoter Defendants had received. The purpose was to allow the Promoter Defendants to shield their trading and profits in Aimsi securities from scrutiny and recovery by regulatory authorities, and afford Ballow a mechanism to control trading and the trading profits in Aimsi stock.   BPI received at least 2 million shares of stock in Aimsi from the Promoter Defendants.

19.     **William Watkins** is an individual residing in Scottsdale, Arizona. Watkins, on information and belief, is an investor who holds approximately 9.5 million shares of Aimsi stock,

7

and who associated with the Promoter Defendants for the purpose of assisting them in the disposition of their shares.

20.     **Dolores Watkins** is an individual residing in Scottsdale, Arizona. She is the joint owner of an account at Piper Jaffray, with William Watkins, that received funds that, on information and belief, were payment for Aimsi stock received by William Watkins.

21.     **Lines Overseas Management** ("Lines") is a broker-dealer headquartered in Hamilton, Bermuda. On information and belief, Lines maintains a brokerage account for WFH into which WFH transferred 100,000 pre-split Aimsi shares.

22.     **Private Funding Corp.** ("PFC") is an entity formed under the laws of Panama. Bassie transferred 1 million pre-split (5 million post-split) shares of Aimsi to PFC in late November 2004 as part of his sale of Aimsi shares to WFH.

23.     **Wonderland Capital Corp.** ("Wonderland") is a corporation organized under the laws of New York, with its principal place of business in Port Jefferson, New York. Wonderland provided consulting services to Aimsi, and in exchange received 10,000 shares of Aimsi stock.

24.     **Orekoya Capital Corp.** is a corporation established under the laws of Panama. An account was opened in its name at Barron Moore, a broker-dealer located in Sarasota, Florida. The Promoter Defendants, through Relief Defendant WFH, transferred 500,000 shares of Aimsi stock to Orekoya's account at Barron Moore.

25.     **Secure Releases** is a corporation established and owned by defendant Bruce Pollock, and maintains an address in Houston, Texas that is the same as defendant Pollock's address. Secure Releases received approximately 2 million shares of Aimsi stock after the completion of the reverse merger, and presently holds approximately 8 million shares.

26.        **China Global Distribution Corp.** is a corporation organized under the laws of

Nevada formed in May 2004. It is a shell company that until recently was nominally headed by an

individual named Luis Pallais, an associate of defendant Ballow.  China Global is actually owned

and controlled by defendant Ballow, through GBY and WFH.  Ballow presented China Global to

Aimsi in order to create a phony pretext for defendants' fraudulent promotional campaign.  China

Global currently holds approximately 5 million shares of Aimsi stock.

## THE PROMOTER DEFENDANTS CONSPIRE WITH
## HALL TO MANIPULATE THE MARKET FOR AIMSI STOCK

27.        The Promoter Defendants are in the business of locating thinly-capitalized private

companies, engineering their entry into the public securities markets through reverse mergers, and

simultaneously taking large and sometimes controlling stakes in the resulting public entities.  The

Promoter Defendants profit from these actions by engaging in "pump and dump" schemes with

these public entities – aggressive and misleading promotional campaigns designed to increase the

trading volume and price of the stock of these newly-public companies.   After their misleading

promotional scheme succeeds in driving up the trading volume and price of the issuer in question,

they promptly sell their stakes into the public market shortly after they acquire them – after which

the price and volume drop precipitously, to the substantial harm of any members of the investing

public who, deceived by the manipulated market activity, purchased shares.

28.        As set forth below, in early 2004 the Promoter Defendants identified defendant

Hall's company, then the privately-held Advanced Integrated Management Systems, Inc.

("Advanced Integrated"), as another opportunity to profit from a market manipulation scheme, and

persuaded Hall to cooperate with them.  On information and belief, Ballow directed and financed

the promotional campaign in whole or in part – and has already obtained substantial trading profits

from it, which he has shared, or intends to share, with the other Promoter Defendants.  Pollock was

a facilitator of this fraudulent promotional campaign, in which Fields and Bassie have also participated.

29.    In early 2004, Advanced Integrated was purportedly developing a potential hand-held device for the homeland security sector that purportedly would be able to detect radiological, chemical and biological agents – the Automatic Large Area Radiation Mapper ("ALARM"). Hall's company faced substantial cash-flow problems, and Hall was introduced to Fields and the other Promoter Defendants in a number of meetings.

30.    Fields advised Hall in their initial meeting, which Pollock also attended, that they could assist Hall in taking his company public, first, by locating a public "shell" company with which the company could execute a reverse merger, and then by assisting his company in accomplishing that merger. Fields told Hall that, in return, the Promoter Defendants would acquire their own substantial stakes in the resulting public entity. He also told Hall that at or about the same time they accomplished the reverse merger, they would also initiate a promotional campaign designed to "support" the trading volume and price of the company's stock. Fields also explained that they would assist in raising additional capital through a private placement. Hall had one or more additional meetings that Fields, Pollock and Bassie also attended, in which they discussed the benefits and procedure of taking his company public with Advanced Integrated's management.

31.    As a result of these meetings, Pollock's company, Secure Releases, contracted with Advanced Integrated. Under the agreement, Secure Releases was charged with the task of locating an appropriate public "shell company," assisting in the execution of the reverse merger, and in engineering a private placement. Secure Releases in return was to receive a substantial stake in the company, which was to be distributed among the Promoter Defendants, including Ballow – who, since December 2003 had been a fugitive, and was living abroad. Hall understood

10

and agreed that the Promoter Defendants would initiate a promotional campaign to increase the trading volume and price of the company's stock. The agreement with Secure Releases specifically included a "penalty share" provision, that provided that Secure Releases would receive an additional 1.8 million shares if Aimsi's stock price exceeded $5 per share within one year.

32.      Pollock procured Carmina Technologies as a suitable shell company, and by the end of June 2004, had assisted Advanced Integrated in becoming public – at which time, after a name change, it was known as Aimsi.

33.      Hall received 80% of Aimsi's stock, approximately 46 million restricted shares. Of the remaining 20% (approximately 11.5 million shares), 5,535,750 shares were distributed to the Promoter Defendants, William Watkins (a Relief Defendant), and associates and family members of the Promoter Defendants. Bassie was also appointed to the Board of Directors of Aimsi.

34.      Ballow directed this scheme. Among other things, Ballow provided financing for it, and arranged for appointing an associate as Aimsi's Chief Financial Officer. Ballow, directly and through his agent, Margarita Chow a/k/a Margarita Chow Kai, a Panamanian attorney ("Chow"), controlled the transfers of Aimsi stock through directions to Pollock, Fields, Bassie, Hall and Aimsi's transfer agent.

35.      At about the same time the Promoter Defendants engineered the reverse merger with Carmina Technologies, Ballow also dispatched Chow to Houston to meet with Pollock, Fields and Bassie and arrange to take control of the Aimsi stock that they had received as part of the reverse merger. While in Houston, Chow arranged for the establishment of several off-shore entities organized under Panamanian law – the Relief Defendants BPI and GBY, for example. The

11

Promoter Defendants intended to transfer the vast majority of their shares in Aimsi to these off-shore entities, and to WFH and WFT.

36.     Ballow owned and/or controlled Relief Defendants WFH, WFT, BPI, and GBY. Ballow and the other Promoter Defendants established these off-shore entities to shield their illicit trading gains from recovery in subsequent enforcement proceedings by regulatory authorities, and to afford Ballow a mechanism to control the trading in Aimsi's stock, and to share in the profits therefrom.

37.     Shortly after Aimsi accomplished its reverse merger, Fields, Pollock and Bassie transferred the substantial majority of their shares in Aimsi to these off-shore entities, effectively placing a substantial amount of Aimsi's stock in Ballow's control.  Bassie and Fields received a total of at least $100,000 in return for these transfers.

## DEFENDANTS' FRAUDULENT PROMOTIONAL CAMPAIGN

38.     With the reverse merger accomplished, the Promoter Defendants initiated their fraudulent promotional campaign in July 2004.  Pollock, Fields and Bassie, with the knowledge and cooperation of Hall, participated in the preparation and dissemination of a series of press releases that intentionally or recklessly misrepresented Aimsi's financial prospects.

39.     On July 19, 2004, defendants issued a press release on behalf of Aimsi that announced that Aimsi had executed a "guaranteed contract that will generate close to $225 million" with China Global, which it described as an "international distributor."  According to this press release, China Global had agreed to purchase 15,000 ALARM units from Aimsi, from which Aimsi expected to earn, at a minimum, a 50% profit margin.   In this press release, Hall also expressed his pleasure at doing business with an "internationally respected group" such as China Global.  The press release quoted Luis Pallais, the CEO of China Global, as remarking that the

12

15,000 units will be "just the tip of the iceberg," in view of the "incredible demand for these devices globally."

40.     On September 10, 2004, defendants issued another press release on behalf of Aimsi, in which they repeated the representation that Aimsi had "already established an international contract worth $225 million for the purchase and distribution of a minimum of 15,000 units. . . . China Global will be purchasing the units."

41.     On November 17, 2004, defendants issued another press release that repeated the prior claims regarding the existence of a $225 million guaranteed sales contract with China Global. In addition, Aimsi announced that it had taken delivery of its first ALARM unit ready for commercial deployment, "a definitive step forward in its efforts to fulfill its contractual obligation of delivery" on the purported sales agreement with China Global. Aimsi again quoted Luis Pallais of China Global as claiming that demand for the ALARM unit will top 200,000 units in "our Asian sales region alone," and that his company was "aggressively hiring account representatives." This November 17 press release was followed by nine additional press releases in the period from November 18 to November 30.

42.     Defendants' press releases were materially false and misleading, and defendants knew them to be so when they disseminated them, or were recklessly indifferent to their truth or falsity. The purported "guaranteed sales" contract for $225 million in revenues that Aimsi repeatedly touted to investors did not exist. Rather, Aimsi had executed a four-page document entitled "Sole & Exclusive Distribution Agreement" (the "Distribution Agreement") that, at most, appointed China Global to be Aimsi's exclusive sales agent for Asia, but did not obligate China Global to purchase any units of the ALARM device, nor did it guarantee any payment or revenue to Aimsi.

43.      China Global, moreover, is not and was not an "international distributor." China Global and its principal officer, Pallais, have no experience in the distribution of products in foreign markets, have no network of sales agents in Asia, and have done nothing to establish one. China Global lacks the financial resources to guarantee any stream of revenue to Aimsi, much less the $225 million represented in Aimsi's press releases.

44.      China Global, in fact, is a public shell company that is owned and controlled by Ballow, through one of his off-shore entities – WFT. Ballow set up China Global and directed the other Promoter Defendants to present it, and the Distribution Agreement, to Hall in order to concoct a pretext for the false promotional campaign they launched regarding Aimsi.

45.      Hall and the Promoter Defendants knew that the foregoing representations concerning China Global and its arrangement with Aimsi were false, or were recklessly indifferent to its truth or falsity.

46.      Aimsi's representations concerning the commercial readiness of its ALARM device were also deliberately and materially false and misleading. The import of its numerous press releases was that the enormous demand for Aimsi's ALARM device would be driven by the hand-held unit's purported ability to detect radiological, biological and chemical contaminants. The representations in Aimsi's November 17 press release that it had taken delivery of its first ALARM unit ready for commercial deployment was materially false and misleading, since at that time, Aimsi did not have a hand-held ALARM unit capable of detecting all three contaminants or agents ready to sell to any customers. In fact, additional development of the ALARM product is necessary before such a fully-capable product is ready for sale.

47.      At the same time that defendants were disseminating these false and misleading press releases, Pollock and Ballow, on behalf of the other Promoter Defendants, were also

14

engaging in a campaign of mass fax and internet broadcasting of stock touts that contained substantially the same misleading statements as Aimsi's press releases. They also contained target stock prices that were utterly baseless. These fax touts and internet postings were purportedly authored by an entity named "Growth Equity," which was set up, controlled and financed by Ballow and Pollock. Bassie, Fields and Hall were aware of this false and misleading promotional campaign and made no effort to stop it or correct the misrepresentations.

48.     On November 17, 2004, Aimsi's five-for-one forward stock split became effective. This stock split was recommended to Hall by the Promoter Defendants, and they caused this split to occur for the purpose of making their promotional campaign more effective. Indeed, the frequency of Aimsi's press releases increased dramatically starting on November 17, with nine additional releases disseminated from then by November 30.

## AIMSI'S FALSE AND MISLEADING PRESS
## RELEASES MANIPULATED THE SECURITIES MARKET

49.     Defendants' false and misleading promotional campaign had a dramatic impact on the market for Aimsi's securities. Before July 19, Aimsi's stock was thinly traded. In fact, as of July 16, the trading day immediately preceding July 19, no shares of Aimsi were traded for the previous 7 days. On July 19, 2004, when Aimsi first announced that it had a "guaranteed contract" with China Global, its share price rose from $1.40 per share (adjusted for a 5-for-1 split on November 17, 2004) to $3.40 with 135,185 shares traded. From November 17 through November 30, 2004, when Aimsi issued nine press releases and the Promoter Defendants were actively disseminating fax tout sheets and internet postings, Aimsi's stock price rose from $1.85 per share to $3.60 per share with daily trading volume reaching as high as 645,163 shares.

50.     Aimsi did not issue another press release until December 14, 2004. Its share price fell to $2.15, but trading volume remained high. On December 7, 2004, over 177,000 shares were

traded. On December 10, 2004, over 121,000 shares were traded. The Commission suspended trading in Aimsi stock on December 15, 2004.

51.     Aimsi resumed trading in the pink sheets on December 30, 2004. From December 30, 2004 through the present, Aimsi's share price has fluctuated between $.50 and $1.00, and the volume has fluctuated from approximately 227 to 129,850.

## THE PROMOTER DEFENDANTS HAVE DERIVED SUBSTANTIAL TRADING PROFITS FROM THEIR SCHEME

52.     The Promoter Defendants intended to manipulate Aimsi's stock from the outset and to reap their profits within the first ninety to one hundred twenty days after Aimsi went public. To this end, the Promoter Defendants devised a plan to transfer their shares to off-shore entities and nominees to sell Aimsi stock and deliver the proceeds back to them.

53.     Pursuant to instructions from the Promoter Defendants, between June 29 and July 16, 2004, Aimsi issued the following (pre-split) shares to the following Defendants, Relief Defendants and related entities:

| Defendant | Shares |
| --- | --- |
| Reginald Hall | 46,057,256 |
| Bruce Pollock and Secure Releases | 2,083,333 |
| GBY (Ballow/Fields) | 2,083,333 |
| Everett Bassie | 2,223,333 |
| Winfred Fields | 100,000 |
| BPI (Pollock) | 150,000 |
| WFH (Ballow) | 200,000 |
| China Global | 1,000,000 |
| William Watkins | 300,000 |
| OSF Financial Services (Broussard and Fields) | 200,000 |

54.     Bassie presently holds in excess of 7.4 million (post-split) Aimsi shares, and Watkins presently holds approximately 9.5 million (post-split) Aimsi shares. The other Relief Defendants also hold substantial amounts of Aimsi shares.

55.     The Promoter Defendants earned trading profits from their pump and dump scheme in an amount not less than $3 million, principally through sales effected by or on behalf of Relief Defendants WFT and WFH in three accounts at United States broker-dealers. These proceeds are and were intended to be shared by the Promoter Defendants. Before the Commission issued its trading suspension, defendants sought to profit in a similar manner through the other off-shore entities they established. Defendants have transferred a substantial portion of their trading profits to off-shore accounts, including bank accounts located in Panama.

## FIRST CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act
### (All Defendants)

56.     Paragraphs 1 through 55 are realleged and incorporated by reference as if fully set forth herein.

57.     From at least 2004 through the present, the Defendants, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by the use of the mails, directly and indirectly, have employed and are employing devices, schemes and artifices to defraud.

58.     From at least 2004 through the present, the Defendants, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by the use of the mails, directly and indirectly, have obtained and are obtaining money and property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and have engaged and are engaging in transactions, practices or courses of business which have operated and will operate as a fraud and deceit upon investors

17

59.     The Defendants knew or were reckless in not knowing of the activities described above.

60.     By reason of the activities described herein, the Defendants have violated and are violating Sections 17(a)(1), (2) and (3) of the Securities Act, 15 U.S.C. §77q(a)(1), (2) and (3).

### SECOND CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (All Defendants)

61.     Paragraphs 1 through 60 are realleged and incorporated by reference as if fully set forth herein.

62.     From at least 2004 through the present, the Defendants, in connection with the purchase and sale of securities, directly and indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails, have employed and are employing devices, schemes and artifices to defraud; have made and are making untrue statements of material fact and have omitted and are omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and have engaged and are engaging in acts, practices and courses of business which operated as a fraud and deceit upon investors.

63.     Defendants knew or were reckless in not knowing of the activities described above.

64.     By reason of the activities described herein, the Defendants have violated and are violating Section 10(b) of the Exchange Act, 15 U.S.C. §§78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

18

## THIRD CLAIM FOR RELIEF
(Relief Defendants)

65. Paragraphs 1 through 64 are realleged and incorporated by reference as if fully set forth herein.

66. Some or all of the proceeds of Defendants' fraudulent conduct alleged above were transferred to, and on information and belief, remain in an account or accounts in the name of Relief Defendants, or are otherwise in their possession and control.

67. Relief Defendants each received, without consideration, proceeds of the fraudulent conduct alleged above. Each of these Relief Defendants profited from such receipt or from the fraudulent conduct alleged above by obtaining illegal proceeds under circumstances in which it is not just, equitable or conscionable form to retain the illegal proceeds. Consequently, each of these entities has been named as a Relief Defendant for the amount of such proceeds by which each has been unjustly enriched as a result of the fraudulent conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Commission respectfully requests that this Court issue:

**I.**

Orders temporarily and preliminarily, and final judgments permanently, restraining and enjoining Defendants, their agents, servants, employees, attorneys-in-fact, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act and Sections 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

19

**II.**

An Order freezing (a) the assets of Defendants Aimsi, Hall, Ballow, Bassie, Fields and Pollock, and (b) the assets of Relief Defendants that constitute proceeds Defendants received as a result of their illegal scheme.

**III.**

An Order temporarily and preliminarily enjoining all Defendants and Relief Defendants from transferring, or assisting or permitting, directly or indirectly, the transfer of, shares of Aimsi's stock.

**IV.**

An Order directing all Defendants and Relief Defendants to file with this Court and serve upon Plaintiff Commission verified written accountings, signed by each of them, under penalty of perjury.

**V.**

An Order permitting expedited discovery.

**VI.**

An Order enjoining and restraining all Defendants, and any person or entity acting at their direction or on their behalf from destroying, altering, concealing or otherwise interfering with the access of Plaintiff Commission to relevant documents, books and records.

**VII.**

A final judgment requiring Defendants and Relief Defendants to disgorge Defendants' ill-gotten gains from the fraudulent conduct alleged in this Complaint, and to pay prejudgment interest thereon.

## VIII.

A final judgment imposing against Defendants civil monetary penalties, pursuant to Section 20(d) of the Securities Act, and 21(d)(3) of the Exchange Act, for the violations alleged therein.

## IX.

A final judgment ordering that, pursuant to Section 21(d)(2) of the Exchange Act, defendants be prohibited from acting as officers or directors of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d).

## X.

Such other and further relief as the Court deems appropriate.

Dated: May 16, 2005
New York, New York

Respectfully submitted,

MARK K. SCHONFELD (MS-2798)
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
3 World Financial Center
New York, New York 10281
(212) 336-1020

Of Counsel:
Andrew Calamari
Doria Bachenheimer
Richard G. Primoff
Candice Gallagher
John Ivascu
Rachel Izower