MARK K. SCHONFELD (MS-2798)
REGIONAL DIRECTOR
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
3 World Financial Center
New York, NY  10281-1022
(212) 336-1020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,                   :
                                                      :
                              Plaintiff,              :
                                                      :
            - against -                               :        05 Civ. 4724 (LLS)
                                                      :
AIMSI TECHNOLOGIES, INC., REGINALD                    :
HALL, HARRIS DEMPSEY "BUTCH" BALLOW,                  :
EVERETT BASSIE, WINFRED FIELDS,                       :        DECLARATION OF
and BRUCE CHARLES POLLOCK                             :        RICHARD G. PRIMOFF
                                                      :
                              Defendants,             :
                                                      :
            - and -                                   :
                                                      :
WILLIAM WATKINS, DOLORES WATKINS,                     :
WRIGHT FAMILY HOLDINGS, INC.,                         :
WRIGHT FAMILY TRUST, GBY INTERNATIONAL                :
PUBLIC RELATIONS, INC., BP INTERNATIONAL,             :
INC., SECURE RELEASES, INC., CHINA                    :
GLOBAL DISTRIBUTION CORP., LINES                      :
OVERSEAS MANAGEMENT, WONDERLAND                       :
CAPITAL CORP.,  PRIVATE FUNDING CORP., and            :
OREKOYA CAPITAL CORP.,                                :
                                                      :
                              Relief Defendants.      :

---

1

I, Richard G. Primoff, pursuant to 28 U.S.C. § 1746, declare the following to be true under penalty of perjury:

1.      I am over eighteen years of age and am employed as a Senior Trial Counsel in the Northeast Regional Office of Plaintiff Securities and Exchange Commission ("Commission").  I make this Declaration in support of the Commission's Application for a Temporary Restraining Order and Preliminary Injunction:  (1) directing Defendants Aimsi Technologies, Inc. ("Aimsi"), Reginald Hall, Everett R. Bassie, Winfred Fields, Bruce Charles Pollock and Harris Dempsey "Butch" Ballow to show cause why they should not be temporarily and preliminarily enjoined from future violations of the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"); and (2) pending adjudication of the foregoing:  (i) freezing Defendants' assets and certain assets of Relief Defendants; (ii) directing Defendants to immediately provide verified written accountings of their assets, signed under penalty of perjury; (iii) prohibiting Defendants from destroying, altering, concealing, disposing of or otherwise interfering with the Commission's access to their records; and (iv) granting expedited discovery.

2.      This action concerns a fraudulent "pump and dump" scheme by defendants in which they acquired a substantial stake in the shares of Aimsi, orchestrated a fraudulent promotional campaign to drive up the price and trading volume of Aimsi's stock, and then sold their shares at substantial profit to the investing public after their plan succeeded.

3.      The Commission brings this action after conducting an expedited investigation. During the course of this investigation, the Commission ordered a suspension in the trading of Aimsi's stock, which expired on December 29, 2004.  The Commission's staff has obtained and

reviewed documents in response to nineteen subpoenas, and has taken testimony of eleven

witnesses, including all defendants except Ballow.

     4.     I make this declaration based upon the information developed during the course

of this investigation. Among the sources of my information and the bases of my belief are

documents obtained and reviewed by the Commission staff and information provided to me by

other members of the Commission staff, as well as information from testimony obtained by the

staff in connection with its investigation of this matter.

### THE PROMOTER DEFENDANTS' BACKGROUND

     5.     Defendants Fields, Bassie, Pollock and Ballow (sometimes collectively referred to

hereinafter as the "Promoter Defendants") are known to one another from past associations with

thinly-capitalized private and/or public shell companies. This prior work consisted of

orchestrating and/or assisting in promotional campaigns of issuers designed to temporarily pump

up the trading volume and price of the stock in question, so that they and their associates could

sell them into the market at inflated prices. Pollock and Ballow have been primarily responsible

for procuring public shell companies and organizing and initiating the promotional campaigns.

Fields and Bassie performed tax, audit and other accounting work in connection with the

promotional campaigns on behalf of these entities. See January 5, 2005 Testimony of Bruce

Pollock ("Pollock Test.") [Exh. 1] at 61-62, 68-70, 77, 83-85, 101-102, 118-124; January 4, 2005

Testimony of Lloyd Broussard ("Broussard Test.") [Exh. 2] at 241-43, 71-93; January 5, 2005

Testimony of Winfred Fields ("Fields Test.") [Exh. 3] at 78-82; December 28, 2004 Testimony of Everett Bassie ("Bassie Test.") [Exh. 4] at 34-55, 273.[1]

6.      Ballow is a stock promoter with a history of defrauding investors through market manipulation schemes.  Ballow resided in Galveston, Texas until December 2004, after he had pleaded guilty to federal criminal charges relating to a scheme to defraud investors.  Released from incarceration before his sentencing, Ballow fled to Panama or Costa Rica, where he owns residences. Exh. 5; Broussard Test. at 92.  Ballow has twice previously been sued by the Commission for fraudulent schemes to manipulate the market for securities:  SEC v. Harris Dempsey Ballow, Christopher Harless, Murry Shepherd and Diane L. Johnson, H-01-CV-2579 (S.D. Tex.), and SEC v. Carl R. Rose, et al., H-04-CV-2799 (S.D. Tex.).  In the former case, Ballow was found liable for securities fraud by engaging in a deliberate scheme to manipulate the market of an issuer's stock.  The latter case is pending.  In 1999, Ballow was found liable in a state court proceeding in Texas for defrauding investors, and was ordered to pay compensatory damages and $8 million in punitive damages.[1] Exh. 6.

7.      Fields is a defendant in SEC v. OSF, Inc., No. H-04-4291 (S. D. Tex.), in which the Commission has alleged that he disseminated a series of false press releases from the issuer, as well as unsolicited junk faxes and spam emails that republished information contained in the false releases.  These actions, the Commission has alleged, were in service of an illegal distribution of approximately 22 million shares of OSF, Inc. ("OSF") stock to the public that

---

[1] See also Broussard Test. at 112-116, 181-82, 210-13; Fields Test. at 31, 45-46, 49-61; 128-132.

resulted in total proceeds of $531,238. Pollock, with Fields' knowledge, engaged stock

promoters for OSF. See Fields Test. at 129-132, 148-151.[2]

8.    As set forth below in detail, in early 2004 the Promoter Defendants identified

defendant Hall's company, then the privately-held Advanced Integrated Management Systems,

Inc. ("Advanced Integrated"), as another "pump and dump" opportunity, and persuaded Hall to

cooperate with them. The evidence developed in the Commission's investigation suggests

strongly that Ballow directed and financed the promotional campaign in whole or in part,

obtained substantial trading profits from it, and shared or promised to share these profits with the

other Promoter Defendants. Pollock played the role of facilitator of this fraudulent promotional

campaign, in which Fields and Bassie also deliberately participated.

### THE PROMOTER DEFENDANTS CONSPIRE
### WITH HALL TO MANIPULATE THE MARKET IN AIMSI'S STOCK

9.    As of early 2004, Advanced Integrated was developing a potential hand-held

device that purportedly would be able to detect radiological, chemical and biological agents – the

Automatic Large Area Radiation Mapper ("ALARM"). December 17, 2004 Testimony of

Reginald Hall ("Hall Test.") [Exh. 7] at 30-48. Hall's company faced substantial cash-flow

problems, and Hall was put in touch with Lloyd Broussard of OSF, through a mutual

acquaintance on the Board of Directors of his company.   Hall inquired of Broussard about

refinancing debt, but Broussard suggested Hall instead take Advanced Integrated public.

Broussard introduced Hall to Fields, who at the time was employed at OSF.  Through Fields,

---

[2] The Commission also named as a defendant in that action Lloyd Broussard, the Chief Executive Officer of OSF. OSF operates as a holding company with subsidiaries engaged in mortgage lending, healthcare and boxing promotion.  Broussard is also the Chief Executive Officer of OSF's mortgage lending subsidiary, OSF Financial

Hall was introduced to the other Promoter Defendants in a number of meetings. Hall Test. at 60-63; Broussard Test. at 93-94, 97-104; Fields Test. at 67-74, 134-35.

10.    Fields advised Hall in their initial meeting, which Pollock also attended, that they could assist Hall in taking his company public by locating a public shell company with which the company could execute a reverse merger. Fields told Hall that, in return, the Promoter Defendants would acquire their own substantial stakes in the resulting public entity. He also told Hall that at or about the same time they accomplished the reverse merger, they would also initiate a promotional campaign designed to support the trading volume and price of the company's stock. Fields also explained that they would further assist in raising additional capital through a private placement. Hall Test. at 62-78; Broussard Test. 152-59, 163; Pollock Test. at 175-187. Hall had one or more additional meetings that Fields, Pollock and Bassie also attended, in which they discussed with Advanced Integrated's management the benefits and procedure of taking his company public. Fields Test. at 157-58; Hall Test. at 66-69; Bassie Test. at 114-17, 119-21.

11.    Pollock's company, Secure Releases, Inc., a Relief Defendant, contracted with Advanced Integrated. Under the agreement (Exh. 8), Secure Releases was charged with the tasks of locating an appropriate public "shell company," assisting in the execution of the reverse merger, and in engineering a private placement. Secure Releases in return was to receive four million shares in the company, which were to be distributed among the Promoter Defendants, including Ballow. Pollock Test. at 182-183, 186-88; Bassie Test. at 196-98. Hall also understood and agreed that the Promoter Defendants would initiate a promotional campaign to

---

Services, Inc. Broussard is a named defendant in <u>SEC v. OSF, Inc.</u>

increase the trading volume and price of the company's stock. Broussard Test. at 152-59, 163. In fact, the agreement that he signed provided a financial incentive to Secure Releases to increase Aimsi's stock price: a "penalty share" provision that provided that Secure Releases would receive an additional 1.8 million shares if Aimsi's share price exceeded $5 within a year. Pollock Test. at 218-220; Exh. 8 at 3.

12.    Pollock procured Carmina Technologies as a suitable shell company, and by the end of June 2004, had assisted Advanced Integrated in becoming public – at which time, after a name change, it was known as Aimsi Technologies, Inc. ("Aimsi"). According to a distribution spreadsheet prepared by Bassie, Hall received 80% of Aimsi's stock (approximately 46 million restricted shares). Of the remaining 20% (approximately 11.5 million shares), 5.535 million shares were distributed to the Promoter Defendants, associates and family members of the Promoter Defendants, and an individual named William Watkins, a Relief Defendant.[3]  Exh. 9.[4] Bassie was also appointed to the Board of Directors of Aimsi.[5] Pollock Test. at 95-96; Fields Test. at 134-36; Hall Test. at 69-74; Bassie Test. at 126-28, 179-199, 259-60.

13.    Ballow was at the center of this scheme. According to Lloyd Broussard of OSF, Bassie conceded that "Nothing happened with [Aimsi] unless Mr. Ballow approved it, … all the

---

[3] As discussed below, Watkins presently holds 9,482,500 shares in Aimsi and evidently was disposing of large numbers of shares for other individuals, including Fields. His precise relationship to the other defendants is not yet known to the Commission, and the Commission requires expedited discovery, in part, to ascertain that information.

[4] These 5.5 million shares were distributed on a "free-trading basis," after the Promoter Defendants obtained a one-page opinion letter from Roger Shoss, a Houston-based attorney. Exh. 10. The remaining 7 million shares were distributed on a restricted basis to the shareholders of Carmina Technologies, Duane Street Group (a company owned or controlled by Pollock and his sister, Mary Pollock), William Watkins and OSF Financial Services, Inc.

[5] In September 2004, Bassie and Fields each received an additional one million shares in Aimsi, and Watkins received an additional 1.7 million shares on the same day. (Exh. 11, p. 34); see also Bassie Test. at 223-24;

shots were being called by Mr. Ballow." Broussard Test. at 141-42. Ballow, among other things, provided financing for the scheme, and arranged for appointing an associate, John Stump, as Aimsi's Chief Financial Officer. Ballow, directly and through his agent, Margarita Chow a/k/a Margarita Chow Kai, a Panamanian attorney ("Chow"), controlled the transfers in Aimsi's stock through directions to Pollock, Fields, Bassie, Hall and Anthony Valinoti, the principal of Aimsi's stock transfer agent, Mandalay Stock Transfer. Broussard Test. at 140-144; 217-219; 179-180. January 28, 2005 Testimony of Anthony Valinoti ("Valinoti Test.") [Exh.12] at 134-37, 139-140, 161-64.

14.    At about the same time the Promoter Defendants engineered the reverse merger with Carmina Technologies, Ballow also dispatched Chow to Houston, to meet with Pollock, Fields and Bassie, and arrange to take control of the Aimsi stock that they had received as part of the reverse merger. Pollock Test. at 59, 90-91. While in Houston, Chow arranged for the establishment of several off-shore entities organized under Panamanian law – the Relief Defendants BP International, Inc. ("BPI"), and GBY International Public Relations, Inc. ("GBY"), for example. Pollock, Fields and Bassie were to transfer the vast majority of their shares in Aimsi to these entities, as well as to Relief Defendants Wright Family Holdings, Inc. and Wright Family Trust, admittedly for the purpose of shielding their assets from recovery in litigation. Fields Test. at 83-89; Pollock Test. at 59, 90-100; Bassie Test. at 217-220, 231-233.[6] From the information obtained during the Commission's investigation, it is evident that Ballow

---

Broussard Test. at 120-21.

[6] Bassie testified that Ballow also attended this meeting.

owned or controlled all of these off-shore entities through Chow, that Ballow and the other Promoter Defendants established these off-shore entities to shield their illicit trading gains from recovery in subsequent enforcement proceedings by regulatory authorities, and to afford Ballow a mechanism to share in those profits.   Fields Test. at 96-97; Bassie Test. at149-153, 217-220; Pollock Test. at 59, 91-100, 237-243.

15.     Shortly after Aimsi accomplished its reverse merger (and as set forth below in greater detail, see ¶¶ 33-41, infra), Fields, Pollock and Bassie transferred the substantial majority of their shares in Aimsi to these off-shore entities, effectively placing a substantial amount of Aimsi's stock in Ballow's control.  Bassie and Fields received a total of at least $100,000 in return for these transfers.  Bassie Test. at 139-140, 217-21; Fields Test. at 110-111; Pollock Test. at 97-98; Exh. 13.

## DEFENDANTS' FRAUDULENT PROMOTIONAL CAMPAIGN

16.     In July 2004, shortly after engineering the reverse merger and transferring their shares in Aimsi to off-shore companies, the Promoter Defendants initiated their fraudulent promotional campaign.  Pollock, Fields and Bassie, with the full knowledge and cooperation of Hall, participated in the preparation and dissemination of a series of press releases that intentionally or recklessly misrepresented Aimsi's financial prospects.  Hall Test. at 82-103; Fields Test. at 209-212, 214-216; Bassie Test. at 268-80; Broussard Test. at 162-63, 166-70.

17.     On July 19, 2004, defendants issued a press release (Exh. 14) on behalf of Aimsi that announced that Aimsi had executed a "guaranteed contract that will generate close to $225 million" with China Global Distribution Corp., which it described as an "international distributor."   According to this press release, China Global had agreed to purchase 15,000

9

ALARM units from AIMSI, from which Aimsi expected to earn, at a minimum, a 50% profit margin. In this press release, Hall also expressed his pleasure at doing business with an "internationally respected group" such as China Global. The press release quoted Luis Pallais, the CEO of China Global, as remarking that the 15,000 units will be "just the tip of the iceberg," in view of the "incredible demand for these devices globally."

18.    On September 10, 2004 (Exh. 15 hereto), defendants issued another press release on behalf of Aimsi, in which they repeated the representation that Aimsi had "already established an international contract worth $225 million for the purchase and distribution of a minimum of 15,000 units . . . China Global will be purchasing the units."

19.    Fields and Bassie had recommended to Hall that Aimsi increase the number of free-trading shares and bring the price of the stock down. On November 17, 2004, Aimsi's five-for-one forward stock split became effective. See Hall Test. at 79-80; Fields Test. at 207-208; Bassie Test. at 293-294. The Promoter Defendants caused this split to occur with the transparent purpose of making their promotional campaign more effective. After the split, the frequency of Aimsi's press releases increased dramatically starting on November 17, with nine additional releases being disseminated from then until November 30 (Exh. 16), the day before the Commission's staff first made an inquiry of Defendants concerning trading activity in the stock. See ¶ 30, infra.

20.    Defendants' November 17 press release repeated the prior claims regarding the existence of a $225 million guaranteed sales contract with China Global. In addition, Aimsi announced that it had taken delivery of its first ALARM unit ready for commercial deployment, "a definitive step forward in its efforts to fulfill its contractual obligation of delivery" on the

purported sales agreement with China Global. Aimsi again quoted Luis Pallais of China Global as saying that demand for the ALARM unit will top 200,000 units in "our Asian sales region alone," and that his company was "aggressively hiring account representatives."

21.    Defendants' press releases were materially false and misleading. The purported "guaranteed sales" contract for $225 million in revenues that the defendants repeatedly touted to investors did not exist. Rather, Aimsi had executed a four-page document entitled "Sole & Exclusive Distribution Agreement" (Exh. 17 hereto) (the "Distribution Agreement") that, at most, appointed China Global to be Aimsi's exclusive sales <u>agent</u> for Asia, but did not obligate China Global to purchase any units of the ALARM device, nor did it guarantee any payment or revenue to Aimsi. December 10, 2004 Testimony of Luis Pallais ("Pallais Test.") [Exh. 18] at 98-105, 167-69.

22.    The foregoing is clear, first, from the Distribution Agreement itself. It contains no term as to price. On the contrary, it explicitly provides that the price would be "subject to each sales contract signed by both parties before each deal" (Exh. 17 ¶ 3) – a term that makes clear that other, future agreements would constitute the sales contracts, not the Distribution Agreement itself. The Distribution Agreement, moreover, appoints China Global to be the sales agent of Aimsi, and contains an incentive provision that awards a percentage of the sales proceeds to China Global, and awards of Aimsi stock to China Global upon the attainment of certain sales targets – all in exchange for the services "to be rendered by [China Global]." These terms are wildly inconsistent with a characterization of the Distribution Agreement as a sales agreement.

23.    Furthermore, despite the fact that the defendants touted this as a "guaranteed" contract for $225 million, the "guarantee" consisted of a promissory note signed by China Global

11

for only $1 million. Even this amount was not "guaranteed" by China Global: It was secured

only by one million shares in Aimsi *that Aimsi transferred to China Global at no cost*. Exh. 19;

Pallais Test. at 144-146; Exh. 20.

24.     China Global, moreover, is not and was not an "international distributor." China

Global and its principal officer, Pallais, have no experience in the distribution of products in

foreign markets, and have no network of sales agents in Asia. China Global lacks the financial

resources to guarantee any stream of revenue to Aimsi, much less the $225 million represented in

Aimsi's press releases. Pallais Test. at 55-59, 112-114, 116-117. Pallais has previously been

convicted for theft, and has a history of personal bankruptcies. His primary business experience

is selling used cars. Pallais Test. at 20-25, 196-99.

25.     China Global, in fact, is essentially a shell company owned and controlled by

Ballow, through one of his off-shore entities – Relief Defendant WFH. Pallais Test. at 44-51;

Broussard Test. at 16; see also Exh. 20. The Commission submits that China Global is a creature

of Ballow and the other Promoter Defendants, and that they presented China Global and the

Distribution Agreement to Hall in order to concoct a phony pretext for the false promotional

campaign they launched regarding Aimsi. See Broussard Test. at 170-76; Pollock Test. at 258;

Fields Test. at 195.

26.     Hall and the Promoter Defendants were well aware of the falsity of the press

releases. Hall conceded that the price term was omitted, and that the Distribution Agreement did

not guarantee $225 million in revenues. Hall Test. at 148-152, 161-63, 178-82. Hall, moreover,

undertook no investigation regarding the financial capabilities of China Global or its business

history before participating in and approving the dissemination of press releases that touted

China Global as a respected international distributor, and its "guarantee" of hundreds of millions

of dollars in revenue. Hall Test. at 113-16; 119-22; Bassie Test. at 263.

    27.    Bassie and Fields have conceded that there was nothing "guaranteed" about the

contract, and Bassie has also conceded it did not constitute a purchase agreement at all. Bassie

Test. 268-69, 246-49; Fields Test. at 211-212. Bassie, a Director of Aimsi, did nothing to correct

the inaccuracies in the press releases. Bassie Test. at 264-65, 268-76.

    28.    Aimsi's representations concerning the commercial readiness of its ALARM

device were also materially false and misleading. The clear import of its numerous press releases

was that the enormous demand for Aimsi's ALARM device would be driven by the hand-held

unit's purported ability to detect radiological, biological and chemical contaminants. Aimsi's

representations in its November 17 press release that it had taken delivery of its first ALARM

unit ready for commercial deployment was materially false and misleading, since at that time,

Aimsi did not have a hand-held ALARM unit capable of detecting all three contaminants or

agents ready to sell to any customers. In fact, additional development of the ALARM product is

necessary before such a fully-capable product is ready for sale. Hall Test. at 35-41.

    29.    At the same time that defendants were disseminating these false and misleading

press releases, the Promoter Defendants – particularly Ballow and Pollock – were also engaging

in a campaign of mass fax and internet broadcasting of stock touts that contained substantially

the same misleading statements as Aimsi's press releases. Pollock Test. at 155-57, 181; Bassie

Test. at 55-57, 67-69, 101; Fields Test. at 201-204, 218. They also contained target stock prices

that were utterly baseless. These fax touts and internet posts were purportedly authored by an

entity named "Growth Equity Corp.," which was set up, controlled and financed by Ballow and

Pollock. Pollock Test. at 86-87, 90-91, 146-155, 242-45; Bassie Test. at 55-57; Fields Test. at 217-18; Exhs. 21-27. Ballow, who had concocted China Global as a false pretext for Aimsi's press releases, and Pollock, knew or were reckless in not knowing that these representations regarding China Global were false. Pollock Test. at 256-62, 268-271, 273-275. Bassie, Fields and Hall were aware of this false and misleading fax and internet promotional campaign, and made no effort to stop or correct them. Bassie Test. at 259-62, 264-65; Fields Test. at 202-03, 211-212, 214-22; Hall Test. at 131-140.

## AIMSI'S FALSE AND MISLEADING PRESS RELEASES MANIPULATED THE SECURITIES MARKET

30.   Defendants' false and misleading promotional campaign had a dramatic impact on the market for Aimsi's securities. Before July 19, Aimsi's stock was thinly traded. In fact no shares of Aimsi were traded for the seven days prior to July 16, the trade date immediately preceding July 19. On July 19, 2004, when Aimsi first announced that it had a "guaranteed contract" with China Global, its share price rose from $1.40 per share (adjusted for a 5-for-1 split on November 17, 2004) to $3.40 with 135,185 shares traded. From November 17 through November 30, 2004, when Aimsi issued nine press releases and the Promoter Defendants were actively disseminating fax tout sheets and internet postings, Aimsi's stock price rose from $1.85 per share to $3.60 per share with trading volume reaching as high as 645,163 shares. Exh. 28.

31.   Aimsi did not issue another press release until December 14, 2004. Its share price fell to $2.20, but trading volume remained high. On December 7, 2004, over 177,000 shares were traded. On December 10, 2004, over 121,000 shares were traded. Exh. 28. The

14

Commission suspended trading in Aimsi's stock on December 15, 2004. A copy of the Commission's order suspending trading is attached hereto as Exhibit 29.[7]

32.    Aimsi resumed trading in the pink sheets on December 30, 2004. From December 30, 2004 through late March, Aimsi's share price fluctuated between $.20 and $1.00, and the volume fluctuated from approximately 150 to 207,000. Since then, Aimsi's share price has decreased, and its trading volume has continued to fluctuate.

## THE PROMOTER DEFENDANTS HAVE DERIVED SUBSTANTIAL TRADING PROFITS FROM THEIR SCHEME

33.    The Promoter Defendants intended to manipulate Aimsi's stock from the outset and to reap their profits within the first ninety to one hundred twenty days after Aimsi went public. See Bassie Test. at 129. To this end, the Promoter Defendants devised a plan to transfer their shares to off-shore entities and nominees to sell Aimsi stock and deliver the proceeds back to them.

### The Promoter Defendants Distribute Their Aimsi Shares to Nominees and Other Entities

34.    Pursuant to instructions from the Promoter Defendants, between June 29 and July 16, 2004, Aimsi issued the following (pre-split) shares to the following Defendants, Relief Defendants and related entities:

| Defendant | Shares[8] |
| --- | --- |

---

[7] Section 12(k) of the Exchange Act authorizes the Commission by order summarily to suspend trading in any security (other than an exempted security) for a period not exceeding 10 business days if "in its opinion the public interest and the protection of investors so require." The Commission has previously exercised this authority when investors are at risk because there is a lack of current and accurate information concerning a company's securities and there are questions of accuracy concerning public statements about the company or its stock.

[8] See Exh. 11, pp. 2-10.

| Reginald Hall | 46,057,256 |
|---|---|
| Bruce Pollock and Secure Releases | 2,083,333 |
| GBY (Ballow/Fields) | 2,083,333 |
| Everett Bassie | 2,223,333 |
| Winfred Fields | 100,000 |
| BP International (Pollock) | 150,000 |
| WFH (Ballow) | 200,000 |
| China Global | 1,000,000 |
| William Watkins | 300,000 |
| OSF Financial Services (Broussard and Fields) | 200,000 |

35.     On July 16, 2004, GBY transferred 500,000 shares to WFH. Exh. 11, p. 11. As described above, Relief Defendant GBY is the Panamanian entity which Chow set up for Fields in July 2004. That same day, Bassie transferred 500,000 shares to WFH in exchange for $100,000. Exh. 30. Bassie received $100,000 from WFH via wire transfer on or about August 9, 2004. Bassie Test. at 152-153, 217-219; Fields Test. at 173.

36.     Bassie also transferred approximately 1 million pre-split shares to Private Funding Corp., another Panamanian entity established by Chow, on or about November 29, 2004. Exh. 31, pp. 26-27; Valinoti Test. at 255-57, 261-64; Bassie Test. at 152-53.

37.     Bassie received an additional 100,000 pre-split Aimsi shares from Aimsi on August 14, 2004. Exh. 11, p. 18. Bassie also received 1,083,333 pre-split Aimsi shares from Hall in September, 2004.[9] Exh. 11, p. 34; Bassie Test. at 223-26.

38.     On or about July 6, 2004, an individual named William Watkins, a Relief Defendant, received 300,000 Aimsi shares. Exh. 11, pp. 2, 5. Watkins transferred 100,000 of

---

[9]Bassie transferred 330,000 of those shares to nominees on October 4, 2004. Exh. 31, pp. 1-5. On November 28, 2004, Bassie transferred 50,000 post-split Aimsi shares to R. Fetter and 50,000 shares to D. Bankston, both of whom sold their shares. Exh. 31, p. 28. According to an Aimsi filing on Form 8-K dated February 1, 2005 (the "February 8-K"), Bassie holds 7,451,665 post-split Aimsi shares. Exh. 32.

those shares to George Tissen on October 21, 2004. Exh. 31, p. 7. Tissen transferred $80,000 to Watkins on September 7, 2004 and $10,000 on September 29, 2004. Exhs. 33 and 34.

39.    On or about September 8, 2004, Watkins received 1.7 million (pre-split) Aimsi shares from Hall. Exh. 11, p. 34. Watkins transferred approximately 754,000 of those shares to approximately 34 individuals or entities on October 21, 2004. Exh. 31, pp. 7-14. Each of these individuals or entities transferred cash to Watkins's account at Piper Jaffray, or into a brokerage account at Piper Jaffray held jointly with Relief Defendant Dolores Watkins (Account Nos. ███ 2305 and ███3089). This indicates that they each appeared to pay $1 per Aimsi share. For example, Watkins transferred 50,000 shares to Bruce Green who transferred $50,000 to Watkins on September 27, 2004. Attached as Exhibit 35 are portions of the relevant account statements showing these transfers.[10]

40.    GBY (the Panamanian entity Chow set up for Fields) transferred 300,000 shares to Watkins on August 18, 2004. Exh. 11, p. 28. Although Fields claims to have never had the ability to obtain the shares held by GBY (Fields Test. at 94, 110-11), Watkins transferred $300,000 to Fields on December 8, 2005 (Exhibit 38) - evidently payment for the 300,000 shares transferred on August 18.

41.    It appears that Relief Defendant Secure Releases (an entity created by Pollock) continues to hold the majority of the shares received by Pollock/Secure Releases in July;

---

[10] Documents produced by the Promoter Defendants show that the initial distribution of Aimsi shares provided for the distribution of 200,000 (pre-split) shares to Relief Defendant William Watkins as the "kick off guy." Exh. 36. Watkins also, as of December 31, 2004, held 250,000 shares of Aimsi stock in an account at NevWest Securities Corp. (Account No. 6300-1671). Exhibit 37.

however, Pollock transferred 2.5 million post-split shares to Watkins on November 30, 2004.[11]

Exh. 31, p. 28. According to the February 2005 8-K, Secure Releases holds 7,916,665 post-split

shares and Watkins holds 9,482,500 post-split Aimsi shares. It appears that Watkins may have

played a role in disposing of Aimsi shares and transmitting the proceeds thereof for the Promoter

Defendants. The precise relationship of Watkins to the Promoter Defendants and the full nature

of the role he played in this pump and dump scheme is presently unknown, and is one area as to

which the Commission requires expedited discovery.

### Defendants Have Already Realized Substantial Trading Profits

42.    The trading records obtained by the Commission during its investigation also

demonstrate, as set forth below, that the Promoter Defendants earned trading profits from their

pump and dump scheme in an amount not less than approximately $2.5 million through sales

effected on behalf of Relief Defendants WFT and WFH for the period August 25, 2004-

December 14, 2004 – entities owned and controlled by Ballow through Chow. The Commission

believes these proceeds are and were intended to be shared by the Promoter Defendants, and that

before the Commission issued its trading suspension, these defendants sought to profit in a

similar manner through the other off-shore entities they established – BP International, Inc. and

GBY.[12]

---

[11]Pollock's entity BP International, Inc. continues to hold the 150,000 shares it initially received in July 2004.

[12] This $2.5 million figure is in addition to the $300,000 that Watkins transferred to Fields after Fields (via GBY) transferred 300,000 Aimsi shares to Watkins. That figure also excludes an additional sum of approximately $713,500 that William and Dolores Watkins received from individuals to whom William Watkins had transferred Aimsi shares.

43.     The Commission's staff has been able to identify three accounts in the United States that the Promoter Defendants used to sell the Aimsi shares held by WFT/WFH. The first two are brokerage accounts, one held at Barron Moore, a broker-dealer located in Dallas, Texas (Account No ▮▮2900) and Franklin Ross, a broker-dealer firm located in Parkland, Florida (Account No ▮▮2979). WFH also transferred 100,000 (pre-split) shares of Aimsi to an account at Lines Overseas Management, a Bermuda-based brokerage firm ("LOM"). Exh. 39. These shares were placed in an account used by LOM for executing trades in the United States at Boston Safe Deposit & Trust Co. ("BSDT"), which sold these shares at an account established at TD Waterhouse for this purpose. Copies of the relevant account documents for the accounts at Barron Moore, Franklin Ross and T.D. Waterhouse are attached hereto as Exhibits 40-42, respectively. The account at T.D. Waterhouse was set up on a "delivery versus payment" basis, i.e., the proceeds from WFH's sales of Aimsi shares at TD Waterhouse were transferred automatically to BSDT, Account No ▮▮▮002. Exhibit 43.

**WFH's Barron Moore Account**

44.     Although WFH made two small sales of Aimsi in August, WFH began selling in earnest on August 25, 2004 through an account opened by Chow at Barron Moore, Account No. ▮▮2900. From August 25, 2004 through October 7, 2004, WFH sold 48,280 Aimsi (pre-split) shares through its Barron Moore account and received proceeds of $543,811.61. Exh. 40. These sales coincided with the dissemination of a Growth Equity fax tout sheet entitled "Growth Equity News Alert" which, among other things, projected that Aimsi's stock price (then in the $11 range) would reach $28 in three months. See Exh. 21.

19

45.    WFH subsequently sold 161,800 (post-split) shares from its Barron Moore account on November 29 and 30, 2004 and received proceeds of $479,114.89. Exh. 40. These sales coincided with the series of 9 fraudulent press releases Aimsi issued from November 17, 2004 through November 30, 2004. Exh. 16. It appears that all or substantially all of these trading proceeds were transferred out of WFH's account at Barron Moore to a Panamanian bank (Global Bank Corp., Account No. ████4434, and Global Bank Overseas Ltd., ████6275) at or about the time the Commission initiated its investigation into Aimsi, and/or ordered a suspension in the trading of Aimsi's stock. Exh. 44.

46.    WFH also transferred 500,000 (post-split) shares from its Barron Moore account to a Barron Moore account in the name of Orekoya Capital ("Orekoya") (Account No. ████ 2967), a Relief Defendant. Exh. 45. Orekoya transferred 200,000 shares of Aimsi stock from its Barron Moore account to its own account at Sterling Financial Investment Group. Upon information and belief, Orekoya is located in Panama. Between December 2 and December 17, 2004, Orekoya sold 192,000 Aimsi shares and received $505,220.91 in proceeds. Exh. 46.

47.    WFH also transferred 1.5 million post-split Aimsi shares from its Barron Moore account to China Global's account at Barron Moore (Account No. ████4062). Exh. 47. China Global is a Relief Defendant.

### WFH's Franklin Ross Account

48.    WFH also transferred 1 million (post-split) Aimsi shares to Wright's Franklin Ross account on November 22, 2004. Exh. 48. Wright sold 30,000 of those shares on November 30, 2004 and received $91,115.97 in proceeds. Exh. 41.

### The T.D. Waterhouse Account

20

49.     Between November 19 and November 29, 2004, Wright sold 464,000 (post-split) Aimsi shares through the LOM account at T.D. Waterhouse and received proceeds of $1,127,947.79.  Exh. 42.

### Wonderland Capital Corp.

50.     Relief Defendant Wonderland Capital Corp. ("Wonderland") is a New York corporation that purports to be a business consultant.  Wonderland's President, Eugene Austin, has done business with Pollock in the past.  February 9, 2005 Testimony of Eugene Austin [Exh. 49] ("Austin Test.") at 54-55.  Austin was retained by Pollock to obtain contracts for sale of the ALARM unit in the Northeast and was paid in shares transferred from Wright's account at Franklin Ross to Wonderland's account at Franklin Ross (Account No. 3191). Austin Test. at 56, 61-62; Exh. 50. Wonderland executed an agreement with Aimsi on January 10, 2005 pursuant to which Wonderland agreed to provide consulting services to Aimsi including marketing and the filing of a 15c2-11.  Exh. 51.

51.     Aimsi has also retained Wonderland Capital, a purported business consultant, to raise funds, prepare a 15c2-11 filing and provide business advice. Austin Test. at 186; Exh. 51. Austin appears to have no significant experience as a business consultant aside from a deal he worked on with Pollock a few years ago.  More recently, Austin appears to have worked with Pollock on another company involving Wright, Sun Rayz Products, and appears to be currently working with Pollock on an entity named QI Industries.  Austin Test. at 48, 50, 56, 58-60, and 70-72.

### THE COMMISSION REQUIRES EXPEDITED DISCOVERY

52.     It is clear from the foregoing evidence that the defendants have acted in a calculated manner to distribute their shares in Aimsi among nominees and off-shore entities for the purpose of effecting and concealing substantial trading profits.  Indeed, defendants already caused a substantial amount of their trading profits to be transferred out of the United States to Panama.

53.     The Commission's investigation to date has not revealed the full extent of defendants' trading profits, the precise locations of defendants' assets and proceeds, and the identity and role played by their associates, including but not limited to the Relief Defendants.[13] The Commission respectfully submits that in order to ensure the efficacy of an asset freeze, to preserve the status quo and to protect the Commission's ability to collect on a judgment for disgorgement and penalties in this action, it must be afforded the right to obtain discovery regarding these matters on an expedited basis.  In addition, the Commission submits that an order requiring the preservation of all documents and other information relating to this action is warranted.

Executed on May 16, 2005
New York, New York

Richard G. Primoff

---

[13] The accounts of the Defendants that the Commission has to date been able to identify have been listed in the proposed Order submitted with this application.