DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7-24-09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - -X
SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,                          05 Civ. 4724 (LLS)

- against -                         MEMORANDUM AND ORDER

AIMSI TECHNOLOGIES, INC., REGINALD
HALL, HARRIS DEMPSEY "BUTCH" BALLOW,
EVERETT BASSIE, WINFRED FIELDS,
and BRUCE CHARLES POLLOCK,

                Defendants,

- and -

WILLIAM WATKINS, DOLORES WATKINS,
WRIGHT FAMILY HOLDINGS, INC., WRIGHT
FAMILY TRUST, GBY INTERNATIONAL PUBLIC
RELATIONS, INC., BP INTERNATIONAL,
INC., SECURE RELEASES, INC., CHINA
GLOBAL DISTRIBUTION CORP., LINES
OVERSEAS MANAGEMENT, WONDERLAND
CAPITAL CORP., PRIVATE FUNDING CORP.,
and OREKOYA CAPITAL CORP.,

                Relief Defendants
- - - - - - - - - - - - - - - - - - - - - -X

Plaintiff Securities and Exchange Commission brought this

action alleging that, from July 2004 though November 2004,

defendants Harris Dempsey "Butch" Ballow, Reginald Hall, and others

conducted a "pump and dump" scheme by which they fraudulently

inflated the price of the stock of Aimsi Technologies, Inc.

("Aimsi")[1] by publicly disseminating false information that touted

Aimsi and then sold their Aimsi stock to the public through

---

1   Aimsi was known as Advanced Integrated Management Services, Inc. until
it changed its name on October 19, 2004.

intermediaries, including relief defendants Wright Family Holdings, Inc. ("Wright Family Holdings"), Wright Family Trust, and Orekoya Capital Corp. ("Orekoya").   The SEC asserts claims against defendants for violations of section 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a), section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and against relief defendants for receiving ill-gotten gains without consideration.

Pending are the SEC's May 19, 2009 motions (1) for the entry of judgment by default against defendant Ballow and relief defendants Wright Family Holdings, Wright Family Trust, and Orekoya and (2) to determine the amounts of disgorgement, prejudgment interest, and civil penalties owed by defendant Hall under a previously-entered judgment against Hall, to which he consented.

Relief defendant Lines Overseas Management ("LOM"), a Bermuda broker-dealer, also remains in the case.[2]  The relief the SEC seeks against LOM, however, is limited to funds in an account owned by Wright Family Holdings that LOM has frozen under a June 13, 2005 Stipulation and Order Resolving Motion for Preliminary Injunction

---

2    The case has been resolved against the other defendants and relief defendants.  The SEC voluntarily dismissed its claims against relief defendants Dolores Watkins, Secure Releases, Inc., China Global Distribution Corp. ("China Global"), GBY International Public Relations, Inc., BP International, Inc., Wonderland Capital Corp., and Private Funding Corp.  The Court entered final money judgments on consent against defendants Aimsi, Winfred Fields, and Bruce Charles Pollock and relief defendant William Watkins.  Defendant Everett Bassie proceeded to trial, which resulted in a judgment dismissing the claims against him.

Against Relief Defendant Lines Overseas Management, Ltd., and thus there is no just reason for delay in adjudicating the SEC's motions. See Fed. R. Civ. P. 54(b).

On May 21, 2009, the Court ordered that responses to the SEC's motions were due by July 6, 2009 "or the relief requested by the SEC may be granted by the entry of judgment by default." (May 21, 2009 Order.) No responses have been received.

## I.  MOTION FOR DEFAULT JUDGMENT AGAINST BALLOW, WRIGHT FAMILY HOLDINGS, WRIGHT FAMILY TRUST, AND OREKOYA

The SEC commenced this action on May 16, 2005 with the filing of its complaint and application for emergency interim relief and a preliminary injunction. Defendant Ballow and relief defendants Wright Family Holdings, Wright Family Trust, and Orekoya have not answered the complaint or otherwise appeared, and the SEC moves for judgment by default against them.

In accordance with Local Civil Rule 55.2(b), on December 22, 2008, the SEC obtained certificates of default from the Clerk against Wright Family Holdings, Wright Family Trust, and Orekoya, which requires a showing by affidavit that, inter alia, "the pleading to which no response has been made was properly served." Local Civil Rule 55.1. The SEC has not obtained a certificate of default against Ballow; instead, it now seeks an order deeming its service on Ballow effective and the entry of his default by the Court. See 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2682 (3d ed. 1998) ("The

- 3 -

fact that Rule 55(a) gives the clerk authority to enter a default is not a limitation on the power of the court to do so.").

Ballow is a fugitive. On September 16, 2003, he pleaded guilty to money laundering in the United States District Court for the Southern District of Texas (U.S. v. Harris Dempsey Ballow, CR-H-02-729-01), and he was released on bond on November 21, 2003. He participated in the Aimsi promotional campaign at issue in this case while released on bond. Ballow did not appear for his sentencing on December 16, 2004, and the court issued a warrant for his arrest that day. His whereabouts have been unknown ever since.

Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and section 27 of the Exchange Act, 15 U.S.C. § 78aa, authorize service of process in any "district of which the defendant is an inhabitant or wherever the defendant may be found." On May 16, 2005, the Court issued an Order to Show Cause, Temporary Restraining Order, and Order Freezing Assets and Granting Other Relief ("Order to Show Cause"), which provided for expedited service on Ballow and the other defendants and relief defendants as follows:

**IT IS FURTHER ORDERED** that a copy of this Order and the papers supporting the Commission's Application be served so as to be received by Defendants on or before May 17, 2005, by personal delivery, facsimile, overnight courier, or first-class mail, except in Bermuda by May 18 and in Panama by May 19, 2005.

(May 16, 2005 Order to Show Cause Art. XII.)

The SEC argues that it complied with the Order to Show Cause with respect to Ballow by delivering its papers to his last known

- 4 -

address.  It also argues that it served Ballow by service on relief defendants that he owns and controls.

"When a court considers personal jurisdiction in the posture of a default judgment, 'although the plaintiffs retain the burden of proving personal jurisdiction, they can satisfy that burden with a prima facie showing,' and 'may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain.'"  D'Onofrio v. Il Mattino, 430 F. Supp. 2d 431, 438 (E.D. Pa. 2006), quoting Mwani v. bin Laden, 417 F.3d 1, 7 (D.C. Cir. 2005); see also Old Republic Ins. Co. v. Pac. Fin. Servs. of America, Inc., 301 F.3d 54, 57 (2d Cir. 2002) ("In New York, a process server's affidavit of service establishes a prima facie case of the account of the method of service, and thus, in the absence of contrary facts, we presume that Pacific was properly served with the complaint.").

The SEC filed a declaration of its process server showing that, on May 16, 2005, the SEC sent the summons and complaint, the Order to Show Cause, and its emergency motion papers by Federal Express overnight delivery to Ballow at 1203 Maui Drive, Galveston, Texas, 77554, which the SEC's process server states is "the last-known address that the Commission's staff determined during its investigation."  (June 12, 2005 Ivascu Decl. of Service ¶ 3.)

The evidence on the record contradicts the SEC's contention that Ballow's Galveston, Texas address is his last known address.

When Ballow was released on bond on November 21, 2003, he was subject to supervision by the U.S. Pretrial Services Office in Houston, Texas. According to U.S. Pretrial Services in its petition for a warrant for Ballow's arrest, which the SEC attached as an exhibit to its declaration of service and to the declaration of Richard Primoff in support of the SEC's application for default judgment, Ballow's "last reported address was located at 1111 Post Oak, #613, Houston, TX, 77056." (May 19, 2009 Primoff Decl. in Supp. of Default J. Ex. D, Petition for Action on Conditions of Pretrial Release 2.) Lloyd Broussard, a former business associate of Ballow's, also testified that while Ballow had a house on Tiki Island in Galveston County, after his release from jail he had bought a house and was living in Houston. (See May 16, 2005 Primoff Decl. Ex. 2, Jan. 4, 2005 Broussard Test. 92:6-14.) Since the SEC had the information regarding Ballow's Houston address when it sought to serve him, on the current record the SEC has not shown that its delivery of process only to Ballow's Galveston address, where he apparently was no longer living even before he fled, was sufficiently calculated to reach Ballow.

However, the SEC also argues that its service on certain relief defendants owned and controlled by Ballow was effective service on Ballow, and the Court agrees with respect to the SEC's service on Wright Family Holdings and Wright Family Trust.

The Second Circuit recently restated the general principles

that "'alter egos are treated as one entity' for jurisdictional purposes," Transfield ER Cape Ltd. v. Indus. Carriers, Inc., --- F.3d ---, No. 09-1733-cv, 2009 WL 1940859, at *2 (2d Cir. July 8, 2009), quoting Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc., 933 F.2d 131, 142-143 (2d Cir. 1991), and, in turn, "'service on the alter ego of a corporation constitutes effective service on the corporation'" id., quoting King v. Galluzzo Equip. & Excavating, Inc., No. 00 CV 6247(ILG), 2001 WL 1402996, at *6 (E.D.N.Y. Nov. 8, 2001).

"Establishing the exercise of personal jurisdiction over an alleged alter ego requires application of a less stringent standard than that necessary to pierce the corporate veil for purposes of liability." Storm LLC v. Telenor Mobile Commc'ns AS, No. 06 Civ. 13157(GEL), 2006 WL 3735657, at *13 n.8 (S.D.N.Y. Dec. 15, 2006), citing Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981). In Kinetic Instruments, Inc. v. Lares, the court held:

. . . the court may use its equitable powers to pierce the corporate veil to prevent fraud and injustice. As the court in Minnesota Mining emphasized, when preserving the corporate entity would permit a shareholder to avoid legal liability, "this is precisely the situation in which courts feel most comfortable in using their equitable powers to sweep away the strict legal separation between corporation and stockholders." Minnesota Mining, 757 F.2d at 1265; see also Mobil Oil Corp., 718 F. Supp. at 269-70. Here, the defendant was the dominant shareholder in the corporation. Plaintiff alleges that defendant told the Vice-President of Kinetic that even if Kinetic won the lawsuit against Lares Research, he "had taken measures to see that Kinetic will never get anything." Magid also states that in the same conversation, Lares said that "Any victory Kinetic might achieve will be a Pyrrhic victory." Defendant denies

that he made such statements, and further states that he
has not taken any steps to frustrate or avoid the payment
of any judgment arising out of the present case or the
corporate action. However, construing all allegations as
true as we must for the purposes of this motion, we find
that plaintiff has alleged sufficient facts to make a
prima facie showing that the corporate entity should be
disregarded, thus subjecting defendant to jurisdiction on
this basis.

Kinetic Instruments v. Lares, 802 F. Supp. 976, 986 (S.D.N.Y. 1992)
(internal citations to the record omitted).

Here, the SEC has made a prima facie showing that disregarding
the distinction between Ballow and relief defendants Wright Family
Holdings and Wright Family Trust is warranted "to prevent fraud and
injustice," such that the SEC's service on Wright Family Holdings
and Wright Family Trust was effective service on Ballow. Wright
Family Holdings and Wright Family Trust are alternative names for
the same entity (May 19, 2009 Primoff Decl. in Supp. of Default J.
5 n.2; see May 16, 2005 Primoff Decl. Ex. 12, Jan. 28, 2005
Valinoti Test. 139:15-140:12), which the SEC alleges was
"established, owned and controlled by defendant Ballow under the
laws of Panama or the Commonwealth of Dominica" (Compl. ¶ 16). The
SEC alleges that Ballow "established these off-shore entities to
shield their illicit trading gains from recovery in subsequent
enforcement proceedings by regulatory authorities, and to afford
Ballow a mechanism to control the trading in Aimsi stock, and to
share in the profits therefrom." (Id. ¶ 36.) The SEC's
uncontroverted evidence shows that Ballow owns and controls the

Wright Family entity as a personal off-shore account, which he used to acquire Aimsi stock during Aimsi's promotional campaign at issue.[3]  Ballow has now concealed his whereabouts to avoid legal action against him, and the proceeds from the Wright Family entity's sales of Aimsi stock have dissipated.  While the SEC's documents show that the Wright Family entity obtained over \$2.2 million from its sales of Aimsi stock, the SEC has located less than \$1 million in its accounts.  Ballow and the Wright Family entity failed to comply with the Court's June 14, 2005 Order Granting Preliminary Injunction and Other Relief ("Preliminary Injunction Order"), which required them to "immediately repatriate into the United States" assets from abroad (June 14, 2005 Preliminary Injunction Order Arts. V and VI) and provide an accounting of certain assets and liabilities (id. Art. VIII).[4]

The SEC has thus made a sufficient showing of proper service on Ballow by its service on Wright Family Holdings and Wright Family Trust.[5]  Since the time to answer the complaint has expired,

---

3    See May 16, 2005 Primoff Decl. Ex. 1 (Jan. 5. 2005 Pollock Test. 67:14-68:11, 97:22-24, 235:24-237:13, 238:23-239:6, 241:16-242:4); id. Ex. 3 (Jan. 5, 2005 Fields Test. 172:18-173:18, 175:20-176:7, 177:7-10); id. Ex. 4 (Dec. 28, 2004 Bassie Test. 151:19-152:3, 217:22-219:19); May 19, 2009 Primoff Decl. in Supp. of Default J. Ex. C (May 26, 2005 Pollock Test. 296:18-297:2); Pl.'s Trial Ex. 3 (May 26, 2005 Pollock Test. 304:11-305:1).

4    When the Court issued the Preliminary Injunction Order, Wright Family Holdings had \$310,000 from its sales of Aimsi stock in an account at the Montserrat branch of its Panamanian bank. On June 28, 2005, the SEC commenced an action in Montserrat to repatriate those funds, and it served Wright Family Holdings and Wright Family Trust in that proceeding. They did not appear, and the Montserrat court granted the SEC's application. On January 25, 2006, the funds were deposited in a Court Registry Investment System account for this case.

5    While the SEC has made a prima facie showing of service on Ballow sufficient to support its application for default judgment, "a 'defendant is always free to ignore the judicial proceedings, risk a default judgment, and then

he is in default, as are Wright Family Holdings, Wright Family Trust, and Orekoya, the allegations against them in the complaint as to liability are accepted as true, see Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981), and the Court directs the entry of judgment by default against them.

## II.  MOTION FOR MONEY JUDGMENT AGAINST HALL

Without admitting or denying the SEC's allegations, defendant Hall consented to the entry of a December 3, 2007 Judgment as to Defendant Reginald Hall ("Consent Judgment").  The Consent Judgment permanently enjoins Hall from violating section 17(a) of the Securities Act, section 10(b) of the Exchange Act, and rule 10b-5 thereunder and requires him to "pay disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]." (Dec. 3, 2007 Consent Judgment Art. IV.)  Hall agreed that "The Court shall determine the amounts of the disgorgement and civil penalty upon motion of the Commission" (id.), which the SEC has now submitted.

The Consent Judgment precludes Hall from "arguing that he did not violate the federal securities laws as alleged in the Complaint" and from challenging the validity of the Consent

challenge that judgment on jurisdictional grounds in a collateral proceeding'" and "Such a jurisdictional challenge can be based on inadequate personal service."  Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d 146, 160 (2d Cir. 2005), quoting Ins. Corp. of Ireland v. Campagnie des Bauxites de Guinee, 456 U.S. 694, 706, 102 S. Ct. 2099, 2106 (1982).

Judgment.   (Id.)   Furthermore, under the Consent Judgment, "the allegations of the Complaint shall be accepted as and deemed true by the Court" for purposes of the SEC's motion.   (Id.)

## III. REMEDIES

The SEC seeks disgorgement plus prejudgment interest against Wright Family Holdings, Wright Family Trust, and Orekoya.   As against Ballow, the SEC seeks disgorgement plus prejudgment interest, a third-tier civil penalty, a permanent injunction against violations of section 17(a) of the Securities Act, section 10(b) of the Exchange Act, and rule 10b-5 thereunder, and an order prohibiting Ballow from acting as an officer or director of a public company.   As against Hall, the SEC seeks disgorgement plus prejudgment interest and a third-tier civil penalty.

### A.   Disgorgement and Prejudgment Interest

"Upon a finding that the federal securities laws have been violated, the district court has broad 'equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits.'"   SEC v. Rosenfeld, NO. 97CIV.1467WHPRLE, 2001 WL 118612, at *1 (S.D.N.Y. Jan. 9, 2001), quoting SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1474 (2d Cir. 1996).

A court may also order disgorgement against a relief defendant "'who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds.'"   SEC v.

Cavanagh, No. 98 Civ. 1818DLC, 2004 WL 1594818, at *31 (S.D.N.Y. July 16, 2004), quoting SEC v. Cavanagh, 155 F.3d 129, 136 (2d Cir. 1998). "When there has been no consideration given for the receipt of the ill-gotten gains, there is no legitimate claim to the funds and a relief defendant must return the proceeds." Id.

"The amount of disgorgement ordered 'need only be a reasonable approximation of profits causally connected to the violation,'" and "'any risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty.'" First Jersey Sec., 101 F.3d at 1475 (alteration in original), quoting SEC v. Patel, 61 F.3d 137, 139, 140 (2d Cir. 1995). "'[T]he SEC bears the ultimate burden of persuasion that its disgorgement figure reasonably approximates the amount of unjust enrichment, [but] once the SEC has made a reasonable showing of a defendant's illicit profits, the burden shifts to the defendant to show that the disgorgement figure was not a reasonable approximation.'" SEC v. Tannenbaum, No. 99-CV-6050 (ARR)(JMA), 2007 WL 2089326, at *4 (E.D.N.Y. July 19, 2007) (alterations in original), quoting SEC v. Opulentica, LLC, 479 F. Supp. 2d 319, 330 (S.D.N.Y. 2007).

"As with disgorgement, an award of prejudgment interest lies within the discretion of the Court." SEC v. Haligiannis, 470 F. Supp. 2d 373, 385 (S.D.N.Y. 2007). "'Requiring payment of interest prevents a defendant from obtaining the benefit of what amounts to

- 12 -

an interest free loan procured as a result of the illegal
activity.'" Id., quoting SEC v. Moran, 944 F. Supp. 286, 295
(S.D.N.Y. 1996). Prejudgment interest is generally calculated at
the rate used by the Internal Revenue Service for interest on
underpaid taxes under 26 U.S.C. § 6621(a)(2) because "That rate
reflects what it would have cost to borrow the money from the
government and therefore reasonably approximates one of the
benefits the defendant derived from its fraud." First Jersey Sec.,
101 F.3d at 1476.

## 1.   Relief Defendants

The SEC seeks disgorgement against Wright Family Holdings and
Wright Family Trust in the amount of $2,229,087.07 and against
Orekoya in the amount of $550,220.91, representing the ill-gotten
gains from their sales of Aimsi stock.  The SEC has sufficiently
supported its request.  Its evidence shows the following.

All of the accounts at issue for the Wright Family entity are
in the name of Wright Family Holdings, but since they are the same
entity, Wright Family Holdings and Wright Family Trust are jointly
and severally liable for the ill-gotten gains in those accounts.

In July 2004, Wright Family Holdings received 1.2 million
Aimsi shares.[6]  The SEC alleges that the Wright Family entity paid
no consideration for its shares.  There is evidence that Ballow
paid $100,000 for a block of Aimsi shares in July 2004 and that a

---

6   Aimsi subsequently effected a 5-for-1 stock split on November 17, 2004.

portion of those shares were transferred to Wright Family Holdings. However, the Court cannot determine from the record how many shares from that purchase went to Wright Family Holdings for purposes of deducting the consideration paid for them from the proceeds received from their sale. "The burden falls on defendants to dispel uncertainty as to the proper calculation of disgorgement and they have not done so." Haligiannis, 470 F. Supp. 2d at 385.

From August 25, 2004 to November 29, 2004, Wright Family Holdings sold 704,480 Aimsi shares from three accounts for a total of $2,229,087.07[7], for which it is liable in disgorgement. An award of prejudgment interest on that amount is also appropriate, which the SEC has permissibly calculated at the IRS underpayment rate from December 1, 2004 through December 31, 2008, in the amount of $710,766.99.

On November 19, 2004, Wright Family Holdings transferred 500,000 Aimsi shares to Orekoya. There is no evidence Orekoya paid any consideration for those shares.

From December 2, 2004 to December 17, 2004, Orekoya sold 192,000 Aimsi shares for $505,220.91, for which it is liable in disgorgement. An award of prejudgment interest on that amount is also appropriate, which the SEC has permissibly calculated at the IRS underpayment rate from January 1, 2005 through December 31,

---

7    The SEC asserts that Wright Family Holdings sold 466,400 Aimsi shares from its LOM account for $1,115,044.60. The LOM account statement, however, shows that Wright Family Holdings sold 464,400 Aimsi shares for $1,127,947.79. The Court adopts the SEC's lower figure of $1,115,044.60.

2008, in the amount of $158,329.99.

## 2. Ballow

The SEC seeks disgorgement against Ballow in the amount of $2,734,307.98, representing the sum of the ill-gotten gains of the Wright Family entity and Orekoya. It argues that he "established and controlled the Defaulting Relief Defendants for the purpose of obtaining and holding trading profits in Aimsi stock" and "As such, Ballow directly benefited from his fraudulent conduct to the same extent (at a minimum), as the Defaulting Relief Defendants." (May 19, 2009 Primoff Decl. in Supp. of Default J. ¶ 13.)

The allegations in the complaint accepted as true and the undisputed evidence on the record establish that Ballow used the Wright Family entity as his utensil to trade Aimsi stock for his own benefit. Ballow is therefore liable in disgorgement for the gains received in the Wright Family Holdings accounts. See Rosenfeld, 2001 WL 118612, at *3 (holding defendant liable for disgorgement of ill-gotten gains from sales of stock made by "nominees he controlled").

The SEC seeks to hold Ballow and the Wright Family entity each severally liable for an amount equal to those gains, but such an award would exceed the amount of their unjust enrichment since Ballow used the Wright Family entity as his own account. Rather, Ballow is jointly and severally liable with Wright Family Holdings and Wright Family Trust for the disgorgement and prejudgment

- 15 -

interest they owe.

The SEC has not established Ballow's liability for the gains received by Orekoya. The complaint does not allege that Ballow owns or controls Orekoya, and the SEC cites no evidence in its motion papers that supports its conclusory assertion that he owns and controls Orekoya. Thus, Ballow is not liable for the disgorgement owed by Orekoya.

### 3. Hall

The SEC asserts that Hall transferred his Aimsi stock to relief defendant William Watkins, who sold the stock and remitted the proceeds to Hall, for which the SEC seeks disgorgement in the amount of $648,615. In support of its request for disgorgement against Hall, the SEC submits the June 8, 2005 Supplement to Declaration of Reginald Hall and the August 1, 2005 Declaration of William Watkins.[8]

The SEC argues that on August 25, 2004, Watkins transferred $200,000 from the sale of Aimsi stock to HOF Records for Hall. The SEC has not met its burden of persuasion that the payment to HOF

---

8    Hall submitted his June 8, 2005 declaration in response to a May 25, 2005 Stipulation and Order requiring Hall to file and serve on the SEC a verified written accounting of, inter alia:

    (2)   all assets, funds, securities, and real or personal property received by Defendant, or any other person controlled by Defendant, in connection with the offer, purchase, or sale of Aimsi's securities, from June 1, 2004 to the date of the accounting and the disposition of such assets, funds, securities, real or personal property.

(May 25, 2005 Stipulation and Order ¶ 4.)

Watkins submitted his August 1, 2005 declaration as an accounting of his transactions in Aimsi stock.

Records constituted proceeds received by Hall.  Hall states that the payment was for defendant Winfred Fields:

The transfers on 08/11/04 and 08/25/2004 were paid to HOF Records on behalf of Winfred Fields.  I believe Winfred Fields transferred 300,000 shares of stock in GBY to Mr. Watkins in August 2004, for these payments totaling $300,000.00.

(May 19, 2009 Primoff Decl. in Supp. of Money J. Ex. E, June 8, 2005 Supp. to Hall Decl. ¶ 6.)

Watkins does not say whether his payment to HOF Records was for Hall or Fields.

Thus, Hall is not liable in disgorgement for the $200,000 Watkins transferred to HOF Records.

The SEC has met its burden of persuasion that the remaining $448,615 in disgorgement it seeks against Hall based on Watkins's payments to Eureka Artworks and Red Stone Federal Credit Union and Watkins's purchases of two cars for Hall represent a reasonable approximation of Hall's ill-gotten gains.  While Hall states in his declaration that "The transfers to Eureka Artworks, Redstone Federal Credit Union, and the cars, I don't believe are the results of a sale of stock" (id. ¶ 7), Watkins provides a detailed accounting showing that those payments and cars were proceeds from his transactions in Aimsi stock (see id. Ex. D, Aug. 1, 2005 Watkins Decl. ¶¶ 5, 9).  Hall's statement that he has "since executed a promissory note where I can repay Mr. Watkins for these items" (id. Ex. E, June 8, 2005 Supp. to Hall Decl. ¶ 7) is devoid

- 17 -

of evidentiary support and, in any event, is immaterial. See Rosenfeld, 2001 WL 118612, at *2 ("it is irrelevant for disgorgement purposes, how the defendant chose to dispose of the ill-gotten gains; subsequent investment of these funds, payments to charities, and/or payment to co-conspirators are not deductible from the gross profits subject to disgorgement").

Accordingly, Hall is liable for disgorgement in the amount of $448,615. Under the Consent Judgment, the SEC is entitled to its request for prejudgment interest at the IRS underpayment rate from January 1, 2005 through April 30, 2009.[9]  The SEC is directed to calculate that interest on the $448,615 in disgorgement.

**B.   Civil Penalties**

Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), authorize the imposition of civil penalties in three tiers, depending on the severity of the offense, for violations of the federal securities laws. If the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons," the third tier authorizes a penalty up to the greater of

---

9    The Consent Judgment provides that "Prejudgment interest shall be calculated from December 31, 2004" (Dec. 3, 2007 Consent Judgment Art. IV), whereas the Consent of Defendant Reginald provides for prejudgment interest "calculated from October 31, 2004" (Consent of Defendant Reginald Hall ¶ 5). Since the SEC requests prejudgment interest against Hall calculated from January 1, 2005, that discrepancy is not material.

$120,000 for each violation or the gross pecuniary gain from the violation.[10]  See 15 U.S.C. §§ 77t(d)(2)(C) and 78u(d)(3)(B)(iii), adjusted for inflation by 17 C.F.R. § 201.1002.

Third-tier penalties are warranted against Ballow and Hall. The allegations in the complaint accepted as true as to Ballow and Hall show their participation in a scheme to fraudulently inflate the price and trading volume of Aimsi stock and sell their stock on the market at the inflated prices, in violation of section 17(a) of the Securities Act, section 10(b) of the Exchange Act, and rule 10b-5 thereunder. The scheme was egregious because it involved the dissemination of numerous press releases, faxes, and Internet postings over the course of several months that materially misrepresented both the commercial readiness of Aimsi's Automatic Large Area Radiation Mapper product and the nature of its agreement with its purported international distributor, China Global, thereby defrauding public investors. Ballow and Hall each demonstrated a high degree of scienter. "Ballow presented China Global to Aimsi in order to create a phony pretext for defendants' fraudulent promotional campaign" (Compl. ¶ 26), and he engaged in the "campaign of max fax and internet broadcasting of stock touts" of Aimsi that "contained target stock prices that were utterly baseless" (id. ¶ 47). Hall was Chief Executive Officer, President,

---

10    The first tier applies to any violation. See 15 U.S.C. §§ 77t(d)(2)(A) and 78u(d)(3)(B)(i).  The second tier applies to violations that "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement."  Id. §§ 77t(d)(2)(B) and 78u(d)(3)(B)(ii).

and a Director of Aimsi during the fraudulent promotional campaign and was "aware of this false and misleading promotional campaign and made no effort to stop it or correct the misrepresentations." (Id.)  In one press release, Hall "expressed his pleasure at doing business with an 'internationally respected group' such as China Global" (id. ¶ 39), while Hall "knew that the foregoing representations concerning China Global and its arrangement with Aimsi were false," or was "recklessly indifferent to its truth or falsity" (id. ¶ 45).  Ballow and Hall each used an intermediary to sell their Aimsi stock on the market during the fraudulent promotional campaign at artificially inflated prices, generating substantial profits.

Ballow's and Hall's violations thus involved fraud and deceit and created substantial losses or a significant risk of substantial losses to investors who purchased Aimsi stock at the inflated prices.  Since "The exact number of violations committed by the Defendants is nearly impossible to determine," SEC v. Invest Better 2001, No. 01 Civ. 11427(BSJ), 2005 WL 2385452, at *5 (S.D.N.Y. May 4, 2005), the Court imposes a third-tier civil penalty against Ballow equal to his pecuniary gain, $2,229,087.07, and against Hall equal to his pecuniary gain, $448,615.

## C.  Permanent Injunction and Director and Officer Bar

Under section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and section 21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d)(1),

the Court may order a permanent injunction against violations of the securities laws "where there has been a violation of the federal securities laws and there is a reasonable likelihood of future violations." Haligiannis, 470 F. Supp. 2d at 383. Under section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), the Court may prohibit an individual from serving as an officer or director of a public company where the person has violated the anti-fraud provisions and "the person's conduct demonstrates unfitness to serve as an officer or director of any such issuer."

The circumstances here weigh heavily in favor of a permanent injunction and permanent director and officer bar against Ballow. Ballow's conduct was egregious and demonstrated a high degree of scienter, as discussed above. Ballow participated in the Aimsi scheme while released on bond after pleading guilty to money laundering in the Southern District of Texas, and he fled with the proceeds in the accounts of his off-shore nominee. He has not appeared to take responsibility for his actions. Ballow also has a history of securities law violations. In SEC v. Harris Dempsey Ballow, H-01-CV-2579 (S.D. Tex.), on November 30, 2003, the court entered a judgment against Ballow finding that he violated the anti-fraud provisions of the federal securities laws, permanently enjoining him from violating those provisions and from engaging in the promotion of securities, and ordering him to pay a third-tier civil penalty of $1,100,000. In SEC v. Carl R. Rose, H-04-CV-2799

(S.D. Tex.), on February 22, 2006, the Court entered an amended judgment by default against Ballow finding that he violated, inter alia, the anti-fraud provisions of the federal securities laws, permanently enjoining him from violating those provisions, and ordering him to pay $14,304,973 in disgorgement and an equal amount as a third-tier civil penalty.  In 1999, Ballow was found liable by a jury in Texas state court for defrauding investors and ordered to pay rescission and $8 million in punitive damages.  See Texas Capital Secs. v. Sandefer, 58 S.W.3d 760 (Tex. App. 2001) (affirming judgment against Ballow).   Ballow's history of violations demonstrates his disregard for securities laws and "'gives rise to an inference of a reasonable expectation of continued violations.'" SEC v. Platinum Inv. Corp., No. 02 CV 6093(JSR), 2006 WL 2707319, at *4 (S.D.N.Y. Sept. 20, 2006), quoting SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1100 (2d Cir. 1972).

Thus, a permanent injunction and director and officer bar shall be imposed against Ballow.

## CONCLUSION

The Court directs the entry of judgment by default against defendant Ballow and relief defendants Wright Family Holdings, Wright Family Trust, and Orekoya:

(1) requiring Wright Family Holdings, Wright Family Trust, and Ballow, jointly and severally, to pay disgorgement in the

- 22 -

amount of $2,229,087.07, plus prejudgment interest in the amount of $710,766.99;

(2) requiring Orekoya to pay disgorgement in the amount of $505,220.91, plus prejudgment interest in the amount of $158,329.99;

(3) requiring Ballow to pay a third-tier civil penalty in the amount of $2,229,087.07;

(4) permanently enjoining Ballow from violating section 17(a) of the Securities Act, section 10(b) of the Exchange Act, and rule 10b-5 thereunder; and

(5) permanently prohibiting Ballow from acting as an officer or director of any issuer that has a class of securities registered under section 12 of the Exchange Act or that is required to file reports under section 15(d) of the Exchange Act.

The Court directs the entry of judgment against defendant Hall requiring him to pay (1) disgorgement in the amount of $448,615, plus prejudgment interest to be calculated by the SEC as directed above and (2) a third-tier civil penalty in the amount of $448,615.

On or before July 31, 2009, the SEC shall submit a proposed judgment in accordance with this memorandum and order.

So ordered.

Dated: New York, New York
       July 22, 2009
            23

                                        Louis L. Stanton
                                        LOUIS L. STANTON
                                        U.S.D.J.  7/23/09

- 23 -